UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

BERRY PLASTICS CORPORATION,　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Plaintiff,　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　vs.　　　　　　　　　　)　　3:15-cv-00170-RLY-MPB
　　　　　　　　　　　　　　　　　　)
ILLINOIS NATIONAL INSURANCE　　　)
COMPANY,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Defendant.　　)

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This case arises out of a lawsuit between Plaintiff, Berry Plastics Corporation, and

its former customer, Packgen, which resulted in a $7.2 million jury verdict against Berry.

*Packgen v. Berry Plastics Corp., et al.*, Cause No. 2:12-cv-80-JAW (D. Maine).  At the

time of the events alleged in the *Packgen* lawsuit, Berry had $1 million in commercial

general liability (or "CGL") insurance coverage with Federal Insurance Company and an

additional $25 million in commercial umbrella liability insurance coverage that was

issued by the Defendant herein, Illinois National Insurance Company.  Federal agreed to

defend and indemnify Berry in the *Packgen* lawsuit; Illinois National did not.

In Count I of Berry's Complaint for Declaratory Relief and Damages, Berry seeks

a declaration that Illinois National had a duty to defend and indemnify it against the

*Packgen* lawsuit, including the judgment and appeal.  Berry brings two additional claims

against Illinois National: breach of contract (Count II) and bad faith (Count III).

1

Illinois National moves for summary judgment on Counts I-III of Berry's Complaint or, in the alternative, moves for summary judgment on Count II and III. Berry, in turn, cross-moves for summary judgment on Counts I-II. The court, having read and reviewed the parties' written submissions, the designated evidence, and the applicable law, now **GRANTS** Illinois National's Motion for Summary Judgment and **DENIES** Berry Plastics' Cross-Motion for Summary Judgment.

## I.    Background

Packgen manufactures and sells intermediate bulk containers ("IBCs") that are used, among other applications, by petroleum refineries to transport and store catalyst, a chemical agent used to refine crude oil. (Filing No. 1-2, Packgen Complaint ¶ 4). Packgen manufactured the subject IBCs out of a woven polypropylene fabric that is chemically bonded to a layer of foil laminate. (*Id.* ¶ 6). The design was custom-made for CRI, one of Packgen's customers and a producer of fresh catalyst. (Filing No. 41-1, Trial Transcript of John Lapoint[1] ("Lapointe Tr.") at 34). Berry manufactured and sold the foil laminate to Packgen. (*Id.* at 17).

From October 2007 to March 2008, CRI purchased 7,567 IBCs for nearly $1.5 million, and it placed an order for 1,359 IBCs to be delivered in April 2008. *See Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 84 (1st Cir. 2017). Packgen also marketed its

---

[1] The court grants Illinois National's request to take judicial notice of the trial transcript from the *Packgen* trial. *See In re FedEx Ground Package Sys., Inc. v. Employment Practices, Lit.*, No. 3:05-MD-527 RM (MDL-1700), 2010 WL 1253891, at *4 (N.D. Ind. March 29, 2010) ("Court documents from another case may be used to show that the document was filed, that the party took [a] certain position, and that certain judicial findings, allegations or admissions were made.") (citing *General Elec. Capital v. Lease Resolution*, 128 F.3d 1074, 1081 (7th Cir. 1997)).

newly-designed IBC to other refineries in North America, focusing on thirty-seven refineries where CRI supplied catalyst containers.  (Lapointe Tr. at 83).

The *Packgen* lawsuit arises out of an incident that occurred at CRI on April 4, 2008.  (*Id.* at 43, 59).  While CRI was lifting an IBC to reposition the container, the foil laminate separated from the woven fabric such that the liner of the IBC was exposed.  (*Id.* at 59, 65).  The liner is meant to work as an oxygen barrier to the catalyst to prevent the catalyst from self-heating.  (*Id.* at 65).  After the incident, CRI cancelled its pending order for 1,359 IBCs with Packgen and has not purchased any IBCs since that time.  (*Id.* at 81-82).  In addition, the thirty-seven refineries did not order IBCs as Packgen had anticipated.  (*Id.* at 105).

On December 9, 2011, Packgen brought suit against Berry for breach of contract, breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, and negligence, in the Superior Court for Androscoggin County, Maine.  (Filing No. 1-2, *Packgen* Complaint at 84-91).  The *Packgen* lawsuit was subsequently removed to the United States District Court for the District of Maine, under Cause No. 2:12-cv-80-JAW.

Berry timely notified Federal and Illinois National of the *Packgen* lawsuit.  (Filing No. 55-8, Declaration of Allyson Claybourn ("Claybourn Decl.") ¶ 5).  Federal agreed to defend and indemnify Berry.  (*Id.* ¶ 6).  Illinois National assigned a claims administrator who monitored and received regular updates on the *Packgen* lawsuit.  (*Id.* ¶ 7).  In June 2013, Illinois National retained coverage counsel to provide legal advice, and in October

2013, sent a reservation of rights letter to Berry. (Filing No. 42-3, Responses of Illinois National to Berry's First Set of Interrogatories at 22-23).

In September 2014, Illinois National's claims administrator contacted Berry to advise that the investigation to date indicated covered exposure was within the limits of the Federal Policy and thus, the Illinois National Policy was not implicated. (*Id.* at 23). In November 2014, Illinois National sent a supplemental reservation of rights to Berry. (*Id.*).

On December 10, 2014, Illinois National's coverage counsel sent a letter to Berry explaining its position that "lost anticipated profits due to anticipated orders that never materialized" are not property damages within the meaning of the Policy. (Filing No. 55-10, Letter dated December 10, 2014). On December 12, 2014, Illinois National attended a mediation of the *Packgen* lawsuit with Federal. (Filing No. 55-9, Claim Notes). Although Federal offered its $1 million policy limits, Illinois National explained its coverage position to the mediator. (*Id.*). The mediation unsuccessfully concluded. (*Id.*).

The case went to trial in November 2015. As is relevant to the present motion, Packgen's President, John Lapointe, testified that Packgen's out-of-pocket losses due to Berry's defective product totaled $643,039.30. (Lapointe Tr. at 92). Packgen's damages expert, Mark Filler, testified that Packgen's lost profits from cancelled orders from CRI would have netted Packgen future profits of $130,629.93. Had CRI continued to do business with Packgen, Filler opined, its sales over the succeeding ten-year period would have earned Packgen future profit of $4,606,405.00. (Filing No. 41-2, Trial Transcript of Mark Filler ("Filler Tr.") at 26). With regard to the thirty-seven oil refineries which

expressed interest in purchasing IBCs from Packgen but changed their minds after the incident, Filler testified that Packgen would have earned future profits of $1,957,202.00 over a ten year period. (*Id.* at 48). In Filler's opinion, anticipated lost profits damages totaled $6,563,607.00. (*Id.* at 42, 48). In addition, the jury was instructed on legal cause; in particular, whether Packgen's damages were "either a 'direct result' or a 'reasonably foreseeable consequence' of the act or failure to act." (Filing No. 55-4, Jury Instructions at 10). The jury was also instructed on the following:

> If you should find for Packgen in accordance with these instructions, then you must determine the amount of damages to which Packgen is entitled as a result of injuries proximately caused by Berry . . . . The elements of damages at issue in this case may include: Actual damages; Incidental damages; and Consequential damages.

(*Id.* at 13-14).

The jury returned a verdict in favor of Packgen and against Berry on November 12, 2015, in the amount of $7,206,646.30 ($643,039.30 + $6,563,607.00). (Filing No. 55-5, Special Verdict Form). The district court entered judgment in favor of Packgen and against Berry the following day.

On November 23, 2015, Berry notified Illinois National of the verdict and requested coverage for the verdict and subsequent judgment. (Claybourn Decl. ¶ 8; Filing No. 55-11, Nov. 23, 2015 Letter). Illinois National maintained that its Policy did not cover Berry's exposure beyond the limits of the Federal Policy. (Claybourn Decl. ¶ 8).

Berry appealed the judgment to the First Circuit Court of Appeals, contending that the district court erred by: (1) denying its motion to exclude Filler's testimony, (2)

5

allowing Packgen employees to testify concerning potential customers' intent to purchase Packgen's IBCs, and (3) denying Berry's motion for judgment as a matter of law, a new trial, or to alter or amend the judgment.  *Packgen Corp.*, 847 F.3d at 83. On February 1, 2017, the First Circuit Court of Appeals affirmed the judgment of the district court.  *Id.* at 91.

## II.   Berry's Insurance Coverage

At the time of the events alleged by Packgen, Berry had two commercial general liability policies to protect it against any liability it may face stemming from its products: the Federal commercial general liability policy covering the first $1 million in liability, and the Illinois National commercial umbrella liability policy covering the next $25 million.  (Claybourn Decl. ¶ 4; Filing No. 42-2, Federal Policy at BP000087; Filing No. 42-4, Illinois National Policy at IN0017914).  Both policies are occurrence-based and include "products-completed operations" coverage.  (Federal Policy at BP000118; Illinois National Policy at IN0017924).

The Federal Policy provides that it will "pay damages that [Berry] becomes legally obligated to pay by reason of liability: imposed by law; or assumed in an **insured contract**; for . . . **property damage** caused by an **occurrence**."  (Federal Policy at BP000091).  The Illinois National Policy provides that it will "pay on behalf of [Berry] those sums in excess of the **Retained Limit** [the $1 million in the Federal Policy] that [Berry] becomes legally obligated to pay as damages by reason of liability imposed by law because of . . . **Property Damage** . . . to which this insurance applies . . . ."  (Illinois National Policy at IN0017915).  In both policies, "property damage" is defined as:

1.   physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

2.   loss of use of tangible property that is not physically injured.  All such loss of use will be deemed to occur at the time of the **Occurrence** that caused it.

(Federal Policy at BP000119; Illinois National Policy at IN0017937).

In addition, the Federal Policy states that Federal has "the right and duty to defend [Berry Plastics] against a **suit**, even if such **suit** is false, fraudulent or groundless."

(Federal Policy at BP000092).  The Illinois National Policy states:

We will have the right and duty to defend any **Suit** against [Berry] that seeks damages for . . . **Property Damage** . . . covered by this policy, even if the **Suit** is groundless, false or fraudulent, when the applicable limits listed in the Schedule of Retained Limits have been exhausted by payment of **Loss** to which this policy applies.

(Illinois National Policy at IN0017984).  The Policy further provides that Illinois National has "the right, but not the duty, to participate in the defense of any **Suit** and the investigation of any claim to which this policy may apply."  (*Id.* at IN0017917).

## III.   Summary Judgment Standard

Summary judgment should be entered if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The fact that both sides have filed motions for summary judgment does not alter the applicable standard; the court must consider each motion independently and will deny both motions if there is a genuine issue of material fact." *Aero Corp. v. Am. Int'l Specialty Lines Ins. Co.*, 676 F. Supp. 2d 738, 741 (S.D. Ind. 2009).

Under Indiana law,[2] an insurance policy is subject to the same rules of interpretation and construction as other contracts. *Cotton v. Auto-Owners Ins. Co.*, 937 N.E.2d 414, 416 (Ind. Ct. App. 2010). "Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence." *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 246-47 (Ind. 2005) (internal quotation marks and citation omitted). If reasonably intelligent persons may honestly differ as to the meaning of the policy language, the policy is ambiguous. *Id.* Ambiguous terms are construed strictly against the insurer. *Id.* When the terms of a policy are clear and unambiguous, however, the court applies their plain and ordinary meaning. *Cotton*, 937 N.E.2d at 416. The interpretation of an insurance policy is a question of law; therefore, disposition on summary judgment is particularly appropriate. *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009).

## IV.   Discussion

The court will first address Berry's claim for a declaratory judgment that the Illinois National umbrella policy provides coverage for the judgment entered against Berry in the underlying *Packgen* lawsuit (Count I). The parties did not address whether Illinois National had duty to defend in Count I; instead, the issue is framed as a claim for breach of contract in Count II.

### A.   Declaratory Judgment on Coverage  (Count I)

As noted above, Illinois National agreed to pay "those sums in excess of the

---

[2] The parties agree that this action is governed by Indiana law.

Retained Limit that [Berry] becomes legally obligated to pay as damages by reason of liability imposed by law because of . . . **Property Damage** . . . to which this insurance applies. . . ."  (Illinois National Policy at IN0017915).  Illinois National does not dispute that the defective and destroyed IBCs which incorporated Berry's product represent "Property Damage" under the Policy.  According to Illinois National, those damages comprise less than the $1 million Retained Limit set forth in the Federal Policy.  It argues that the balance of the damages awarded by the *Packgen* jury which exceed the Retained Limit—lost profits damages—are not "damages because of . . . **Property Damage**" within the meaning of the Policy.  Therefore, it has no duty to indemnify Berry for the *Packgen* judgment.  In response, Berry raises three arguments: (1) Illinois National is estopped from re-litigating the damages determination by the *Packgen* jury; (2) even if Illinois National were entitled to re-litigate the issue, courts have interpreted the phrase "because of" to include all of the damages alleged by Packgen; and (3) at a minimum, the Policy language is ambiguous, and must be construed in favor of coverage.

### 1.      Estoppel

Issue preclusion, or collateral estoppel, "bars subsequent re-litigation of a fact or issue where that fact or issue was necessarily adjudicated in a prior cause of action and the same fact or issue is presented in a subsequent suit."  *Small v. Centocor, Inc.,* 731 N.E.2d 22, 23 (Ind. Ct. App. 2000) (citing *Slutsky v. Crews,* 713 N.E.2d 288, 291 (Ind. Ct. App. 1999)).  To invoke the doctrine, the party seeking estoppel must establish that: (1) there has been a final judgment on the merits in a prior action; (2) the issues are identical; and (3) the party to be estopped was a party or in privity with a party in the

prior action.  *Id.* 28 (citing *Adams v. Marion County Office of Family and Children,* 659 N.E.2d 202, 205 (Ind. Ct. App. 1995)).

The Indiana cases on point apply estoppel to bar the primary liability insurance carrier, which wrongfully denied its defense obligation, from later asserting contractual coverage defenses.  *See State Farm Fire & Cas. Co. v. T.B. ex rel. Bruce*, 762 N.E.2d 1227, 1231 (Ind. 2002); *Fed. Ins. Co. v. Stroh Brewery Co.*, 35 F. Supp. 2d 650 (N.D. Ind. 1998); *Gallant Ins. Co. v. Wilkerson*, 720 N.E.2d 1223 (Ind. Ct. App. 1999).  The insurer may avoid collateral estoppel by defending the insured under a reservation of rights in the underlying action, or by filing a declaratory judgment action for a judicial determination of its rights under the policy.  *State Farm*, 762 N.E.2d at 1231 (citing *Liberty Mut. Ins. Co. v. Metzler*, 586 N.E.2d 897, 900 (Ind. Ct. App. 1992)).

Here, Illinois National is not the primary insurance carrier; it is the excess (or umbrella) carrier.  For the reasons explained *infra.*, in that capacity, Illinois National did not have a duty to defend under the terms of the Policy.  Therefore, the court concludes that it is not estopped from asserting its defense of no coverage.  *See Stroh Brewery*, 35 F. Supp. 2d at 659 ("The doctrine of estoppel arises only where duty to defend exists and has been breached by the insurer." (citation omitted)).  *See also Panfil v. Nautilus Ins. Co.*, 799 F.3d 716, 719 (7th Cir. 2015) (applying Illinois law) ("This estoppel doctrine applies only where an insurer has breached its duty to defend."); *TIG Ins. Co. v. Tyco Int'l Ltd.*, 919 F. Supp. 2d 439, 458-59 (M.D. Pa. 2013) (applying Pennsylvania law) ("Because TIG, an excess insurer, has no contractual duty to defend Grinnell, its insured, it is under no obligation to issue a reservation of rights letter to Grinnell and 'will not be

estopped from later asserting coverage defenses' for failing to do so." (quoting *Montgomery Ward & Co., Inc. v. Home Ins. Co.*, 753 N.E.2d 999, 1006 (Ill. Ct. App. 2001))); Douglas R. Richmond, *New Appleman on Insurance Law Library Edition* § 24.04 (2011) ("Because an excess insurer has no duty to defend its insured, it cannot later be estopped from raising coverage defenses, or be said to have waived those defenses, if it fails to reserve its rights when notified of a claim or suit potentially implicating its coverage.").

Furthermore, an insurer is bound only to the matters necessarily determined in the underlying action. *State Farm*, 762 N.E.2d at 1231 (citing *Frankenmuth Mut. Ins. Co. v. Williams by Stevens*, 645 N.E.2d 605, 608 (Ind. 1995)); *see also Nelson v. Am. Home Assur. Co.*, 824 F. Supp. 2d 909, 915 (D. Minn. 2011) ("[T]he duty to indemnify is determined by the factual findings of a jury.") (citations omitted) (quotation marks omitted), *aff'd*, 702 F.3d 1038 (8th Cir. 2012).  In reconstructing the jury's decision, the court may look to the jury instructions, the jury verdict, and the trial transcript.  *See, e.g.,* 18 Wright & Miller, Fed. Prac. and Proc. § 4420 (stating that the court may reconstruct a jury decision "by considering such indicia as the amount of the award and the reasonableness of various interpretations of the evidence, on the explicit assumption that the jury understood and adhered to the court's instructions on the law"); *TIG Ins. Co. v. Premier Parks, Inc.*, No. Civ. A01C04126 JRS, 2004 WL 728858 (S.C. Del. March 10, 2004) (in apportioning jury verdict between covered and non-covered damages, the court discerned the jury's intentions from the jury verdict and the trial transcript).

In reaching its verdict in favor of Packgen, the jury considered the actual, incidental, and consequential damages it suffered as a result of Berry's defective product. (Jury Instructions at 13-14). The jury concluded that Packgen's actual and lost profits damages were "legally caused" by the failure of Berry's laminate product, and awarded $7,206,646.30 in lump sum damages. (*Id.*). The legal question presented here—whether the anticipated lost profits damages as awarded in the *Packgen* action are "damages because of . . . '**Property Damage**'" within the meaning of the Illinois National Policy— was not decided by the *Packgen* jury. *Afolabi v. A. Mortg. & Inv. Corp.*, 849 N.E.2d 1170, 1175 (Ind. Ct. App. 2006) ("[C]ollateral estoppel does not extend to matters that were not expressly adjudicated and can be inferred only by argument."). As established in the following subsection of this Entry, not all consequential damages are covered property damages within the meaning of the Illinois National Policy. Accordingly, the court finds Illinois National is not barred from asserting its coverage defense.

### 2.    Coverage for Anticipated Lost Profits Damages

The parties agree that the jury's damages figure includes $6,563,607.00 in anticipated lost profits. (*See, e.g.,* Filler Tr. at 26 (testifying that had CRI continued to do business with Packgen over the next ten years, its sales over the succeeding ten years would have earned Packgen a net profit of $4,606,405.00); *see also id.* at 48 (testifying that had Packgen entered into contracts with the 37 oil refineries, its sales would have earned Packgen $1,957,202.00 over a ten year period)). The anticipated lost profits figure represents damages from sales that never occurred, but were expected to occur in the future. (*See e.g., id.* at 3 ("Q: What are lost profits? A: Lost profits is the difference

12

between sales that you expected to make and the cost that you avoided by not having made those sales."); *id.* at 29 ("Q: Did you also factor in lost profits for Packgen for any other categories?  A: Yes.  I calculated lost profits for sales not made to the 37 refineries.").  (*See also* Lapointe Tr. at 95 ("Q:  And you've already testified that you were told by CRI that those sales of [IBCs] would continue into the future and even increase; in fact, more than double?  A: That's right.").

As noted previously, the Policy provides that Illinois National will "pay on behalf of [Berry] those sums in excess of the **Retained Limit** [the $1 million in the Federal Policy] that [Berry] becomes legally obligated to pay as damages by reason of liability imposed by law because of . . . **Property Damage** . . . to which this insurance applies . . . ."  (Illinois National Policy at IN0017915).  Property damage includes "physical damage to tangible property, including all resulting loss of use of that property" and "loss of use of tangible property that is not physically injured."  (*Id.* at IN 0017937).  Intangible losses and purely economic losses do not constitute "property damage" as defined by the Policy. *Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 829 (7th Cir. 1992); *Am. Home Assur. Co. v. Libbey-Owens-Ford Co.*, 786 F.2d 22, 25 (1st Cir. 1986); *Universal Underwriters Ins. Co. v. LKQ Smart Parts, Inc.*, 963 N.E.2d 930, 943-44 (Ill. Ct. App. 2011).  The question presented is whether they are nevertheless covered as damages "because of . . . **Property Damage**."  Neither the court nor the parties have found an Indiana case on point.  Therefore, the court must predict how the Indiana Supreme Court would decide this issue.  *See Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 741 (7th Cir. 2016).

The court first turns to *Travelers*, *supra.*  There, the insured, Penda, received an order from its customer, U.S. Sample, to produce white lithograde styrene sheets.  974 F.2d at 825.  U.S. Sample intended to finish the sheets and then use them as display pages in sample books it had contracted to provide its customer, Joanna Western Mills.  *Id.*  Joanna Western notified U.S. Sample that the pages of the sample books had yellowed.  *Id.*  After U.S. Sample agreed to provide replacement books, it sued Penda for breach of contract and breach of warranty.  *Id.* at 826.  As relief, U.S. Sample sought $200,000 for loss of foreseeable profit from U.S. Sample's contract with Joanna Western; $1,000,000 for loss of foreseeable profit on identified future business with Joanna Western; and $1,000,000 for damage to its reputation.  *Id.*  Penda's insurer, Travelers Insurance Companies, undertook the defense of the suit under a reservation of rights, and later filed an action seeking, in relevant part, whether it had a duty to defend.  *Id.*  The district court ruled in favor of Travelers.  *Id.* at 827.

The Seventh Circuit reversed.  It had "little difficulty in concluding that U.S. Sample's broad allegations of future profit and reputational damage are purely economic losses and beyond the coverage of the policy."  *Id.* at 829.  But it held that U.S. Sample's claim for "lost profits" was partially one for the recovery of its costs in repairing the damaged and rejected sample books.  *Id.*  Those damages, the court clarified, could potentially come within the bounds of the policy, thus triggering Travelers' duty to defend.  *Id.*

Cases from other jurisdictions are consistent with *Travelers*.  For example, in *Nat'l Union Fire Ins. Co. v. Ready Pac Foods, Inc.*, 782 F.Supp.2d 1047 (S.D. Cal. 2011), the

14

insured, Ready Pac, provided contaminated lettuce to Taco Bell. *Id.* at 1049. The lettuce was incorporated into Taco Bell's food, which was destroyed upon learning of the health risk. *Id.* Taco Bell sued Ready Pac to recover, in part, the costs of the destroyed food as well as lost profits from the decline of patronage once customers learned of the E. coli outbreak. *Id.* at 1050. Ready Pac's insurer, National Union, and its excess insurers, filed an action in the Central District of California seeking a declaration of the extent of the obligation that Ready Pac's insurers may become legally obligated to pay to Taco Bell. *Id.*

Before the district court, Taco Bell argued that but for the E. coli outbreak that caused bodily injury and property damage, it would not have suffered lost revenue and profits from a decline in patronage. *Id.* at 1054. The district court rejected this contention because it did not amount to an expense incurred "to remedy either the damage done to tangible property at Taco Bell restaurants or the personal injuries suffered by Taco Bell's customers." *Id.* at 1055. The court explained:

> Taco Bell's claim for lost profits is not a measure of the damage to meals served at Taco Bell restaurants nor the cost of the destroyed contaminated food items. Taco Bell's alleged lost profits as a result of customers deciding not to eat at Taco Bell restaurants nationwide is not a measure of the value of the meals and food that were destroyed at Taco Bell restaurants directly affected by the outbreak.

*Id.* At bottom, "the occurrence itself must directly cause the bodily injury, the injury to tangible property, or the loss of use of the property for coverage to apply." *Id.* at 1057. "As such, damages for loss of goodwill and loss of anticipated profits are not covered

under a liability policy even where such loss of goodwill and loss of profits are alleged to have resulted from covered 'property damage.'"  *Id.*

In *Essex Ins. Co. v. Chemical Formula, LLP*, No. 1:CV-05-0364, 2006 WL 5720284 (M.D. Penn. April 7, 2006), the insured, Formula Technology, manufactured a floor care product called Cold Fusion, which was sold by Janitorial Supply to customers. *Id.* at *1.  Upon application, customers complained the product damaged its floors, requiring the floors to be stripped and restored.  *Id.*  Janitorial Supply sued Formula Technology to recover the cost of Cold Fusion, the cost of repairing the floors, and consequential damages in the form of lost profits and loss of goodwill, which the insured argued were damages "because of" the physical injury to the floor.  *Id.* at *3.

The district court rejected the contention, observing that the purported lost profits did not remedy physically injured property or relate to a loss of use of tangible property. *Id.* at *5.  Rather, the lost profits "arise out of intangible damages that occurred after the physical damage occurred."  *Id.  See also St. Paul Fire & Marine Ins. Co.*, 51 Fed. Appx. 602, 605 (8th Cir. 2002) (agreeing that the "'damages because of property damage clause' . . . does not obligate the insurers to cover sums beyond the $169,095.86 cost incurred in repairing and replacing the 48 riding towels to which Amisol synthetic oil caused actual physical harm" and thus, "lost production, sales, profits, and market share that flowed from the damaged machines . . . are economic losses and business risks not insured under Amisol's CGL policies.").

These cases lead the court to conclude that damages for lost profits are not covered as "damages because of . . . Property Damage" unless they are a measure of the actual

16

physical injury to tangible property or for the loss of use of that property.  The cases cited

by Berry do not persuade the court otherwise.  *See Mid-Continent Cas. Co. v. Circle S*

*Feed Store,* LLC, 754 F.3d 1175, 1186 (10th Cir. 2014) (applying New Mexico law)

(same CGL language covers the loss of value of property which "stemmed directly from

a physical injury to [the] property"); *Wausau Underwriters Ins. Co. v. United Plastics*

*Grp., Inc.*, 512 F.3d 953 (7th Cir. 2008) (applying Illinois law) (noting that although the

jury's lost profits award was not the issue on appeal, the award "was for lost profits

resulting from customers' anger" at the insured for selling them defective water heaters

which damaged their homes); *Nat'l Union Fire Ins. Co. v. Puget Plastics Corp.*, 532 F.3d

398, 403 (5th Cir. 2008) (applying Texas law) (same CGL language covers consequential

damages, including lost profits, that resulted from damage to water heaters); *Ferrell v.*

*West Bend Mut. Ins. Co.*, 393 F.3d 786, 795 (8th Cir. 2005) (applying Wisconsin law)

(same CGL language covers tomato growers for the "property damage" to their tomato

plants arising from defective plastic film).  These cases persuade the court that Berry's

indemnity claim for anticipated lost profits does not arise out of "physical damage to

tangible property, including all resulting loss of use of that property" or "loss of use of

tangible property that is not physically injured."  (Illinois National Policy at IN 0017937).

Accordingly, the court predicts that were this issue before the Indiana Supreme Court, it

would find Illinois National has no duty to indemnify Berry for the *Packgen* judgment

pursuant to the Policy.

### 3.    Ambiguity

Having rejected Berry's first two arguments, the court turns to the third – whether the policy is ambiguous and must be construed in favor of Berry.  A contract is ambiguous "if reasonable persons would differ as to the meaning of its terms."  *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002).  "An ambiguity does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other."  *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 295 (Ind. Ct. App. 1997).  However, "[a] disagreement among courts as to the meaning of a particular contractual provision is evidence that an ambiguity may exist."  *Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 238 (Ind. 2005); *see also Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 936 (Ind. Ct. App. 1999) ("A division between courts as to the meaning of the language in an insurance contract is evidence of ambiguity.").

Berry argues the phrase "because of" is ambiguous because some courts have found coverage for consequential damages arising from property damage, and others have not.  Berry does not provide the names of the cases that are in conflict. Furthermore, the court finds the language of the Policy to unambiguously provide for damages arising from the physical damage to tangible property.  Lost future profits arising from sales not yet made are not causally related to physical property damage. Therefore, the court must find, as a matter of law, that Illinois National had no duty to indemnify Berry under the facts of this case.  Accordingly, Illinois National's Motion for Summary Judgment on Count I is **GRANTED**, and Berry's Motion for Summary Judgment on Count I is **DENIED**.

## B.      Breach of Contract (Count II)

Berry argues Illinois National committed an anticipatory breach—or repudiation—of the insurance contract by failing to defend it during the pendency of the *Packgen* lawsuit.  Such a repudiation or anticipatory breach can give rise to an action for damages.  *Colonial Life & Accident Ins. Co. v. Newman*, 288 N.E.2d 195, 196 (Ind. Ct. App. 1972).  For purposes of this case, "if the insurer's denial of liability goes to the essence of the agreement and amounts to a frustration of the ends it was expected to subserve, the contract may be treated as repudiated, good faith and good intentions of the insurer notwithstanding."  *Id.* (internal quotation marks and citation omitted).  Further, "[w]here liability has been denied by reason of an honest dispute concerning facts which constitute a condition precedent to the insurer's duty to pay benefits pursuant to the terms of a policy of insurance, repudiation will not be found."  *Id.* (citing *Prudence Life Ins. Co. v. Morgan*, 213 N.E.2d 900, 905 (Ind. Ct. App. 1966)).

The Policy provides that Illinois National has a duty to defend a suit against an insured that seeks property damages "when the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by payment of the **Loss** to which this policy applies."  (Illinois National Policy at IN0017984).  The applicable "Retained Limit" is $1 million per occurrence.  (*Id.* at IN0017937).  And the term "Loss" means "those sums actually paid as judgment or settlements."  (*Id.* at IN0017934).  Taken together, Illinois National has no duty to defend Berry unless and until the $1 million Retained Limit is properly exhausted by payment of judgments or settlements to which the Illinois National Policy applies.

19

In the present case, Federal defended Berry in the trial court in the *Packgen* action, and funded the appeal of the judgment.  (*See* Filing No. 1-2, Complaint ¶ 19).  Further, no portion of the judgment has been paid.  Therefore, under the unambiguous terms of the Policy, Illinois National had no duty to defend Berry in the *Packgen* lawsuit because the "Retained Limit" of the Federal Policy has not yet exhausted.  *See Allianz Ins. Co. v. Guidant Corp.*, 884 N.E.2d 405, 420 (Ind. Ct. App. 2008) ("[I]t is the responsibility of the policyholder to prove this condition precedent to coverage—SIR (self-insured retention) exhaustion—and unless and until it is able to do so, the duty to defend is not triggered."); *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 2007 WL 1021825, at *12 (S.D. Ind. 2007) ("[W]here an insured has both primary and excess insurance, an excess insurer has no duty to defend the insured until all primary policies have been exhausted."); *Schwinn Cycling & Fitness, Inc. v. Hartford Acc. and Indem. Co.*, 863 F.Supp. 784, 787 (N.D. Ill. 1994) (holding excess insurer had the right, but not the duty, to defend per the terms of the policy); 14 *Couch on Insurance* § 200.38 ("As a general rule, a true-excess insurer is not obligated to defend its insured until all primary insurance is exhausted or the primary insurer has tendered its policy limits.  An excess carrier may nevertheless voluntarily participate in the insured's defense but has no obligation to do so."); *see also* 14 *Couch on Insurance* § 200.48 ("[T]he true excess insurers' defense obligations are contingent upon the excess policy's terms and conditions.").  It follows, then, that Illinois National has not committed an anticipatory breach of the insurance contract, as its contractual obligation under the Policy is not triggered until Federal's "Retained Limit" exhausts.

Furthermore, damages are an essential element of any breach of contract claim. *Berkel & Co. Contractors, Inc. v. Palm & Assocs., Inc.*, 814 N.E.2d 649, 655 (Ind. Ct. App. 2004); *Rogier v. Am. Testing and Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000), *reh'g denied, trans. denied*. To date, Berry has not been damaged. Berry received a defense from Federal during the entirety of the *Packgen* action and Berry has paid no portion of the judgment.

With respect to Illinois National's duty to indemnify, the Policy provides that it "will not make any payment under this policy unless and until the total applicable **Retained Limit(s)** and any applicable **Other Insurance** have been exhausted by the payment of **Loss** to which this insurance applies." (Illinois National Policy at IN0017983). Illinois National did not breach its contract here for two reasons. First, for the reasons just explained, it did not have a duty to indemnify. Second, even if it did, Illinois National has no obligation to indemnify Berry until the $1 million Retained Limit has been paid towards the final judgment. For all of these reasons, Illinois National's Motion for Summary Judgment on Count II is **GRANTED**, and Berry's Motion for Summary Judgment on Count II is **DENIED**.

### C.   **Bad Faith** (Count III)

Implied in all insurance contracts is the duty of an insurer to deal with its insured in good faith. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515 (Ind. 1993). In *Hickman*, the Indiana Supreme Court recognized, for the first time, a cause of action against an insurer for the tortious breach of that duty. The Court noted that a cause of action for breach does not arise every time an insurance claim is denied. *Id*. at 520. "For example, a good

21

faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith." *Id.*  Instead, an insurer breaches its duty if it "denies liability knowing that there is no rational, principled basis for doing so." *Id.*; *see also Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002) ("To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability."). "Poor judgment or negligence do not amount to bad faith; the additional element of wrongdoing must also be present." *Colley v. Indiana Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998).  "A finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Monroe Guaranty Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005) (quoting *Colley*, 691 N.E.2d at 1261).

Berry contends Illinois National engaged in bad faith by refusing to participate in any settlement negotiations in the underlying *Packgen* lawsuit, even after Berry's primary insurer, Federal, offered to pay its $1 million policy limits.  *See United Farm Bureau Mut. Ins. Co. v. Ira*, 577 N.E.2d 588, 596 (Ind. Ct. App. 1991) ("An insurer breaches its duty to deal with its insured in good faith when it fails to settle claim that could not in good faith be disputed.").  Thus, Berry argues, it "was forced to endure a jury trial resulting in a substantial adverse judgment."  (Filing No. 55, Berry's Response and Brief in Support of Summary Judgment at 42).

The evidence reflects that Illinois National assigned a claims administrator to monitor the *Packgen* lawsuit, conducted an investigation, hired coverage counsel, and attended the December 2014 mediation.  Illinois National's position was, and continues to be, that anticipated lost profits damages are not covered property damages under the Policy, and the court agrees with its assessment.  There is no evidence of ill motive here. Therefore, the court finds, as a matter of law, that Illinois National did not commit the tort of bad faith in this case.  Illinois National's Motion for Summary Judgment on Count III is **GRANTED**, and Berry's Motion for Summary Judgment on Count III is **DENIED**.

## V.    Conclusion

The court finds no genuine issue of material fact exists on Counts I, II, and III of Berry's Complaint and that judgment must be entered in favor of Illinois National. Accordingly, Illinois National's Motion for Summary Judgment on Counts I-III of Berry's Complaint (Filing No. 40) is **GRANTED**, and Berry's Motion for Summary Judgment on Counts I and II (Filing No. 54) is **DENIED**.


**SO ORDERED** this 22nd day of March 2017.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana



Distributed Electronically to Registered Counsel of Record.